## BIRNEY v. READY.

1. EVIDENCE—WRITTEN CONTRACTS—PRESUMPTIONS.
    Where negotiations culminate in a written agreement, the presumption is that it contains all that the parties agreed upon.

2. SPECIFIC PERFORMANCE—EVIDENCE—CROSS-BILL.
    In a suit for the specific performance of a contract to sell to plaintiffs a certain hotel and its furnishings, evidence that plaintiffs had sold their equity in said contract to defendants, who had also purchased all of plaintiffs' vendor's interest therein, *held*, to justify a decree for defendants upon their cross-bill.

3. SAME—CROSS-BILL.
    Where plaintiffs had remained in possession operating said hotel after the sale of their interest therein to defendants, it was within the discretion of the court below, upon defendants' cross-bill praying for an accounting, to order same, reserving judgment thereon until it was had.

Appeal from Berrien; Root (Jesse H.), J., presiding. Submitted June 10, 1921. (Docket No. 44.) Decided October 3, 1921. Rehearing denied February 8, 1922.

Bill by Timothy A. Birney and another against T. Willard Ready and another for the specific performance of a land contract. Defendants filed a cross-bill praying to be decreed sole owners and for an accounting. From a decree for defendants, plaintiffs appeal. Affirmed.

*Thomas J. Cavanaugh* and *Edwin J. Donahue*, for plaintiffs.

*Gore & Harvey*, for defendants.

STEERE, C. J. Plaintiffs filed their bill of complaint

praying enforcement of specific performance of a contract dated November 23, 1914, for purchase of what is known as the Pike House property in the city of Niles, Michigan, with the furniture, etc., therein, from F. S. Claflin and Ella M. Claflin his wife, for a consideration of $13,452.65 and all unpaid taxes assessed against said property since July 12, 1912, insurance premiums paid by the Claflins since that time and costs, with interest thereon, of foreclosing a certain mortgage upon the property given by one George Benson; said taxes, insurance and costs of foreclosing mortgage to be paid before the first day of December, 1914, a further payment to be made of $500, November 23, 1915, and $500 per year thereafter with interest on all sums remaining unpaid, the property to be kept insured and all taxes paid when due until the contract was fully performed. On May 10, 1919, F. S. Claflin and wife conveyed this property to T. Willard Ready of Niles for a cash consideration of $11,518 subject to the contract previously given plaintiffs, on which that amount yet remained unpaid. Under their contract of purchase plaintiffs, who were practical hotel men then operating a hotel at Lawton, Michigan, went into possession of the property they had purchased and have continued to operate a hotel there ever since, keeping up their payments on the contract, or tendering the same, and otherwise fully complying with its terms.

In January, 1920, plaintiffs tendered to Ready the full amount claimed by them to be due under the contract and demanded a deed of the hotel property and bill of sale of the personal property connected with it. Ready refused to accept the tender or to deed the property to them, claiming he was the owner both by virtue of the deed from the Claflins and by purchase from plaintiffs of their interest in the property. On February 9, 1920, plaintiffs filed this

bill for specific performance. Defendants duly answered, and filed a cross-bill praying the court to decree defendant Willard Ready to be "the sole owner of all the real estate and personal property described in the pleadings," admitting his purchase of the same from the Claflins subject to plaintiffs' contract, and setting up a subsequent contract, made June 7, 1917, with plaintiffs under which Ready bought all their interest in the hotel property. The cross-bill also prays for an accounting between the parties covering receipts and disbursements of the hotel under plaintiffs' management since June 7, 1917, being the date of the alleged contract of purchase between Ready and plaintiffs of their interest, and that they be required to deliver possession to Ready of all said described real estate and personal property.

Both parties claim title through F. S. Claflin and Ella M. Claflin, concededly absolute owners of the real estate and personal property in controversy prior to November 23, 1914.

The Pike House was an old and comparatively small hotel with but 18 bedrooms, and there developed some agitation to secure a first-class hotel in the city of Niles which resulted in a meeting of the business men's club on the evening of June 6, 1917, to forward a movement to that end, at which it was proposed to raise sufficient money to secure the Pike House property and either improve the old or erect a new and larger hotel. Subscriptions were obtained for that purpose amounting to some $12,000. One of the Birneys was at the meeting, and also Ready who was one of 20 who each subscribed $500, but Ready protested that but little could be accomplished with the money in sight and deprecated a project favored by others to expend that amount in remodeling the old building. Just what occurred at that meeting is in dispute, but it appears that he advocated a new and

larger fireproof hotel and was out of harmony with what was proposed. The next morning while in the Pike House hotel he had a talk with plaintiffs on the subject in which he expressed disgust with what had taken place the night before and spoke disparagingly of the efforts of those who seemed to be in charge of the meeting, as he claims they did also. The talk led to negotiations for his purchasing their interest in the property and a memorandum of agreement being entered into between them executed in duplicate, each taking a copy, upon which it is undisputed Ready then paid plaintiffs $500 and later additional sums, the total aggregating $3,500, being the amount he claims he agreed to pay them for their equity in the hotel property under the contract which they held from the Claflins. The parties were then on friendly terms, and agreeable to both parties whatever their contract, plaintiffs remained in charge of the hotel, and so continued until this litigation arose. In the meantime it is shown real estate values advanced and this property materially enhanced in value.

Plaintiffs claim it was a part of the agreement made on June 7th that Ready would erect a new hotel upon the site of the old to cost $75,000, upon completion of which he would give them a contract for the purchase of the property along the lines of the Claflin contract. They admit however that no mention of a new hotel or re-sale to them was made in the memorandum of agreement relating to their sale to Ready which passed between the parties. Ready denies that there was any such oral agreement as plaintiffs claim, but that they sold him their entire interest in the property without any conditions. The evidence shows and he does not deny that he contemplated and had plans prepared for the erection of a new hotel, and in the meantime spent some money re-papering and

otherwise repairing the old hotel which was badly run down; he also purchased some hotel furniture and other essentials for a hotel. Shortly after this agreement of June 7th he also purchased property directly adjoining the Pike House hotel site as well as two other pieces of real estate close by. Both parties appear to have talked freely of the deal between them and from what they said, and he did, it soon became a matter of general knowledge and interest. The public press of the city announced the sale of the hotel by the Birneys to Ready and the prospect of his building a large hotel there.

While it is undisputed that there was an agreement between the parties on the subject, made June 7, 1917, with a written memorandum of that date and in duplicate, one taken by Ready and the other retained by the Birneys and put in their safe, each testifies to having lost his copy and none was produced on the hearing.

The controlling controversy in this litigation is narrowed down by plaintiffs' own testimony to the character and contents of this memorandum of agreement.

Plaintiffs in their answer to defendants' cross-bill not only generally "deny that defendant ever satisfied their interest in the (Claflin) contract by any payments" or that they ever assigned to him their interest in said contract, but specifically "deny that they upon the one part and T. Willard Ready upon the other part reduced any agreement of any kind to writing and that they retained a copy and deposited the same in their safe and that defendant retained a copy;" but aside from the positive testimony of Ready and his witnesses on the subject, they directly contradict their pleadings denying a written memorandum, as the following excerpts from their somewhat lengthy testimony shows.

Francis Birney made no mention of this memorandum of agreement in his direct-examination but when asked about it on cross-examination he said in part:

"My brother possibly wrote down the agreement, or Mr. Ready or some one. I didn't. After it was written I slipped out but was in there then. * * * Whether I signed the paper or not I know that if I didn't that paper was written there on that day. * * * He read me the contents of the memorandum in the presence of Mr. Ready. I won't say whether I signed that paper or not * * * my intention was to sign it. * * * That memorandum said that this memorandum agrees to sell T. Willard Ready or words to this effect as he read it to me, the contract between Mr. Claflin and the Birney Brothers. That is what it stated. * * * He gave us a check for $500, at the time, at the time the paper was prepared * * * The amount of the next payment was $2,500 I think, * * * At the time this deal was made and this memorandum was made we were to receive $3,000. * * * It said in the memorandum: 'We hereby agree to sell to Mr. Ready, or words about like that, the Claflin contract, with Birney Brothers.' * * * The paper was signed on or about the 7th of June, 1917, * * * After the memorandum of agreement with Mr. Ready I made no further payments out of my own funds to Mr. Claflin. We requested Mr. Ready when payments were due, time for it to be paid. * * *

"*Q.* What is the total amount you received from Mr. Ready?

"*A.* I think $4,000, but the last $500 was paid on the contract—payment on the contract came due—from Mr. Claflin to us. * * * At the time of sale of our interest to Mr. Ready, in addition to back taxes and insurance, light and water and all those things, I am pretty sure we had paid Mr. Claflin $3,000." * * *

In Timothy Birney's testimony appears the following on cross-examination:

"*Q.* Did that talk result in a memorandum in writing being drawn up?

"*A.* Yes sir.   *   *   *

"*Q.* How many copies were made of it?

"*A.* I don't think there was but two.   *   *   *   I signed it after the agreement was made, yes, sir.

"*Q.* You had a copy of that agreement?

"*A.* Yes, sir. We had it a while. It was in the desk there.

"*Q.* Put it in your safe, did you not?

"*A.* I had it in there for a while and then it was— I took it out and put it in the desk and it got lost or strayed or somewhere.   *   *   *   I looked for it one time. I know when it was. Mr. Ready came in and spoke about it. I don't know whether I found it at that time or not. That was a year and a half ago anyway.   *   *   *   It didn't say that we sold our contract.

"*Q.* It said you agreed to sell and assign.

"*A.* We agreed to assign it.

"*Q.* Your contract with Claflin?

"*A.* Yes, sir; on a certain agreement.   *   *   *. After this agreement was signed and the copies made Mr. Ready paid me $500, and it was placed in the bank to the credit of Birney Brothers.   *   *   *

"*Q.* Tell us what was in the paper, all that you remember, every word that you remember.

"*A.* It started something, 'We hereby agree, to convey our title in the land contract held with Claflin to Mr. Ready at the time of his preparing to build the hotel.'

"*The Court: Q.* Was there anything in that written contract about a hotel?

"*A.* No, sir.

"*Q.* I mean erecting a new hotel?

"*A.* No, sir.   *   *   *

"*The Court:* As far as the writing was concerned, the writing itself, the memorandum, all there was to it was that 'We agree to convey our title in this contract to Mr. Ready for consideration.'

"*Q.* As you think of $3,000?

"*A.* Yes, sir.

"*Q.* That is all there was about it?

"*A.* Yes, sir—that is at such time—

*"The Court:* That was not in the contract?

*"A.* No, that was not in the contract." * * *

Ready, who carried his draft of the agreement in his pocket for some time and showed it to various citizens with whom he talked upon the subject, testified that it read:

"Niles, Michigan, June 7, 1917, We, the Birney Brothers do hereby agree to sell and assign all our title and interest to the property known as the Pike House property, Niles, Michigan, for the sum of $3,500 to be paid on or before the first day of December, 1917;"

that he and the two brothers right then and there signed it, he wrote out and gave them a check for $500, put his own draft of the agreement in his pocket and Tim put theirs in the hotel safe. Several other witnesses who saw it testified that it was signed by both the Birneys and to its provisions in substance as quoted. F. D. Cook, then in charge of the Niles Daily Star, testified that he was anxious to get news for his paper, got word of the deal and interviewed Timothy Birney who said Mr. Ready had bought the hotel, then saw Ready who showed a memorandum of agreement made by Ready with the Birney Brothers for purchase of the hotel, from which he made some notes and wrote an article for his paper telling of the sale, which was produced in evidence; that the agreement Ready showed him was subscribed Birney Brothers and also signed by Timothy A. and Francis J. Birney individually, the substance of it being:

"We the undersigned hereby sell and assign our interest and title in the property known as the Pike House property in the city of Niles, Michigan, to T. Willard Ready for a consideration of $3,500. We acknowledge payment of $500 and the balance of $3,000 to be paid on or before the first day of September, 1917."

Various witnesses testify convincingly to plaintiffs' telling freely that they had sold the property to Ready, Francis stating on more than one occasion that he had both bought and paid them for it.

The trial judge who heard and saw the witnesses found that this agreement was substantially as above quoted and ·

"an absolute, unconditional sale by the Birney Brothers of their interest in the Claflin contract and hotel property to the defendant T. Willard Ready. The testimony of the plaintiffs themselves was very unsatisfactory and far from convincing. * * * But numerous witnesses were produced who knew the contents of the agreement, the sale was reported in the public press, a number of parties testified that one or other of the Birneys had said that they had sold the property. * * * It seems to me that the great preponderance of the evidence clearly shows an absolute sale."

The story told by the Birney Brothers as to an oral agreement in connection with the written memorandum to the effect that Ready would erect for them a new hotel upon the site of the old to cost $75,000 and sell back the property to them, is unsatisfactory and far from convincing. In the first place they claim it was all one transaction, talked over and agreed upon before the memorandum of agreement was signed by them. When such negotiations culminate in a written agreement the presumption is that it contains all they agreed upon. They were experienced business men and it is incredible that they would sign the conceded memorandum of agreement to sell their entire interest in the property with no mention of so important a part of their deal, and credulity is further taxed by their claim that Ready, after paying them $3,500 for their equity and Claflins $11,518 for the full title, would build a $75,000 hotel on the site and then after so large an

investment turn the property back to them when the hotel was completed under a contract the consideration for which was not stated. Francis testified, after stating how Ready was to buy the property and build the $75,000 hotel upon it:

"When the house was built, that we were to take a contract back of the house exactly the same as the Claflins and pay him so much money annually, which was not stipulated, the amount. Nothing was said further on that line."

If the contract was to be "exactly the same as Claflins," the payments would be $500 a year or 150 years in which to pay the cost of the new building alone. While the claimed oral part of the contract is stated by plaintiffs with some variations the nearest terms of payment on the contract Ready was to give them for the property are "we was to pay him back this money and as much more as we could raise," and in another part of Francis' testimony:

"We were to take it off his hands and pay him back the $3,000 and as much more as we could at that time and as much a year afterwards."

The trial court denied specific performance as prayed for in plaintiffs' bill of complaint and granted the relief asked for in defendants' cross-bill, including an accounting, and in the decree, "further ordered, adjudged and decreed that the defendants have judgment against plaintiffs for the amount found due to the defendants upon said accounting."

No testimony appears in the record relative to an accounting, and in the opinion filed by the court it is assumed that matter was waived. Evidently the court subsequently concluded it was not. Having found in favor of defendants on the dominant questions presented, it was within the discretion of the court to order an accounting if asked, reserving judgment thereon until the same was had.

We find no occasion to disturb the decree of the court upon the questions presented by the evidence before us, and the same is therefore affirmed, with costs to defendants.

MOORE, WIEST, FELLOWS, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.